UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

───────────────────────────────────────────────────

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                             Case No. 17-CR-33-JDP

RAYMOND K. BROWN,             Madison, Wisconsin
                                 December 21, 2017
      Defendant.            11:11 a.m.

───────────────────────────────────────────────────

STENOGRAPHIC TRANSCRIPT OF SENTENCING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                 Office of the United States Attorney
                 BY:  ELIZABETH ALTMAN
                     DARREN C. HALVERSON
                 Assistant United States Attorneys
                 222 West Washington Avenue, Suite 700
                 Madison, Wisconsin  53703

For the Defendant:

                 Federal Defender Services of Wisconsin
                 BY:  PETER R. MOYERS
                 22 East Mifflin Street, Suite 1000
                 Madison, Wisconsin  53703

Also appearing:   RAYMOND K. BROWN, Defendant
                 JESSICA HARRIS, U.S. Probation Agent
                 Special Agent WAYNE JACKOWSI, FBI

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
1              (Proceedings called to order at 11:11 a.m.)
2              THE CLERK:  Case No. 17-CR-33-JDP, United States of
3    America v. Raymond Brown, called for a sentencing.  May we have
4    the appearances, please.
5              MS. ALTMAN:  Good morning, Your Honor.  The United
6    States appears by Elizabeth Altman and Darren Halverson, and
7    also with us this morning is Wayne Jackowski, special agent with
8    the FBI.
9              THE COURT:  Very good.  Good morning to you.
10             MR. MOYERS:  Peter Moyers from Federal Defender
11   Services, and seated here to my left is Mr. Brown.
12             THE COURT:  Mr. Brown, Mr. Moyers, good morning to you.
13             MR. MOYERS:  Good morning.
14             THE COURT:  Also let the record show that Jessica
15   Harris, the probation officer who prepared the presentence
16   report, is with us here in the courtroom today.
17        Let's do a quick rundown of what I've looked at to make sure
18   I haven't missed anything here, but I have got the presentence
19   report, an objection from the -- both the defendant and the
20   government.  I've got an addendum to the presentence report and
21   a revised presentence report.  I've got a sentencing memorandum
22   on behalf of Mr. Brown, and then I've also got a written
23   allocution from Mr. Brown as well, and then also with the
24   sentencing memo I think there were some additional documentation
25   verifying Mr. Brown's employment history.
```

| | |
|---|---|
| 1 | That's what I've looked at.  Is there anything that I've |
| 2 | missed -- |
| 3 | MS. ALTMAN:  No, Your Honor. |
| 4 | THE COURT:  -- Ms. Altman?  Mr. Moyers? |
| 5 | MR. MOYERS:  No, Your Honor. |
| 6 | THE COURT:  All right.  Very good.  All right.  Let's |
| 7 | find out who I'm going to hear from today.  Anybody -- are there |
| 8 | any victim witnesses?  I thought I had heard that we might have |
| 9 | a witness. |
| 10 | MS. ALTMAN:  You had heard that correctly, Your Honor. |
| 11 | We have spoken to the victim's family a number of times, him and |
| 12 | his aunt.  They have determined that it would not be healthy for |
| 13 | the victim to be here himself.  We thought the aunt was going to |
| 14 | appear, but we have not seen her yet today. |
| 15 | THE COURT:  Okay.  All right.  So if she shows up, |
| 16 | we'll give her a chance to speak if she wants to. |
| 17 | And, Mr. Moyers, anybody besides you and Mr. Brown today? |
| 18 | MR. MOYERS:  Just me, Your Honor. |
| 19 | THE COURT:  All right.  Very good. |
| 20 | All right.  Mr. Brown, I need to make sure that you have |
| 21 | read the presentence report and the revised presentence report |
| 22 | and talked it over with your attorney.  Have you done that? |
| 23 | THE DEFENDANT:  Yes. |
| 24 | THE COURT:  Okay.  And do you have any other concerns |
| 25 | with the presentence report that haven't been communicated to |

1     me?

2              THE DEFENDANT:  No.

3              THE COURT:  Okay.  Very good.  All right.  So I'm going

4     to adopt the facts in the presentence report as the facts on

5     which I will base my sentence.  I want to hear from Mr. Moyers

6     about some of his concerns about some of the evidence that's

7     substantially Facebook evidence, but I haven't gotten any

8     objections on the factual portions of the presentence report

9     other than the corrections that were made in the addendum.  So

10    I'm going to embrace the presentence report as revised as the

11    factual basis for my sentence.

12         I'm also going to accept the plea agreement on the basis of

13    my findings that the offense of conviction is one that

14    adequately reflects the defendant's criminal conduct and the

15    plea agreement does not undermine the statutory purposes of

16    sentencing.  In determining Mr. Brown's sentence, I will take

17    into consideration the advisory sentencing guidelines and the

18    statutory purposes of sentencing that are set out at Title 18 of

19    the United States Code in Section 3553(a).

20         And I believe that we've resolved all the issues that go to

21    the guideline calculation; is that correct, Ms. Altman?

22              MS. ALTMAN:  I believe so, Your Honor.

23              THE COURT:  Mr. Moyers, do you agree?

24              MR. MOYERS:  Yes.

25              THE COURT:  Okay.  And so with that clarification then

1    that there's not a multicount analysis and starting from the

2    base offense level that was agreed on in the plea agreement,

3    which is 28, then we've got correctly calculated -- starting

4    from that, correctly calculated guidelines.  Base offense level

5    is 28, as I said, pursuant to the plea agreement.  Two levels

6    are added because the defendant was at least ten years older

7    than the Known Victim No. 1.  Two levels are added under

8    guideline 2G1.3(b)(3) because the defendant used Facebook to

9    communicate with and arrange transportation of a sexual act.

10   Two levels are added because Known Victim No. 1 performed sex on

11   the defendant.  No other Chapter Two adjustments apply, so the

12   adjusted offense level is 34.

13        The victim performed sex on the defendant on two separate

14   occasions; therefore, five levels are added under guideline

15   Section 4B1.5(b)(1) because the defendant is a repeat and

16   dangerous sex offender against minors.  The defendant qualifies

17   for what I anticipate will be three levels of downward

18   adjustment, two because he's demonstrated acceptance of

19   responsibility for his offense by entering a timely plea

20   agreement, and I believe the government has moved for an

21   additional one-level reduction or will; is that correct?

22        MS. ALTMAN:  Yes, Your Honor.

23        THE COURT:  Okay.  So that's a total of three levels of

24   downward adjustment for acceptance, so we end with a total

25   offense level of 36.  There's a criminal history category of VI

1     here in this case, and that makes the guideline imprisonment
2     range 324 months to 405 months.  However, the statutorily
3     authorized maximum sentence of 20 years is less than the maximum
4     of the guideline range.  Therefore, the statutory maximum has an
5     impact on the actual guideline calculation.  That makes the
6     guideline range 240 months, and that's pursuant to guideline
7     Section 5G1.1(c)(1).  So that's where we land on the guidelines.
8         Just for comparison purposes too, if not for the plea
9     agreement on the base offense level being 28, we would have a
10    guideline range of 210 months to 240 months if we started with
11    the base offense level that would be 24 just based on the
12    offense of conviction as the starting point there.  But pursuant
13    to the plea agreement, which I think is reasonable in light of
14    the way the case was charged, the guideline range is actually
15    240 months.
16        So that's where we land on the guidelines, so let me get the
17    input of counsel about what sentence I should actually impose.
18    Ms. Altman?
19        MS. ALTMAN:  Thank you, Your Honor.  At first I want to
20    address a couple things in the defendant's sentencing memorandum
21    before I look at the 3553(a) factors, although this does
22    incorporate the factors into my argument as well.
23        First, the idea that the defendant is not a typical
24    enticement offender, I'm not sure that there is a typical
25    enticement offender, and to the extent that this defendant may

1    or may not be or whether there is or isn't, we know what this

2    defendant did, and whether it's typical among others doesn't

3    really matter.

4        To the idea that the defendant has an IQ of 74, based on

5    what we have seen in his past, what we have seen on the video,

6    that -- he doesn't seem like someone with an IQ of 74.  The test

7    was 20 years ago, and I know that IQs typically don't change but

8    perhaps the methodology does.  He's held jobs.  He's gotten a

9    driver's license.  I believe that the Court saw the interview

10   with him.  He appeared to understand all the questions.  He

11   answered responsively.  There was no real indication of any sort

12   of mental challenge significant that I would submit in that

13   interview.

14       Third, whether he does have an IQ of 74 or not, there's no

15   dispute, and he admits, that he relates better to younger

16   people, and, quite frankly, that is what makes him dangerous,

17   and that isn't going to change while he's in prison,

18   particularly if it is an IQ issue.  If he gets out when he's 44,

19   he's still going to relate better to younger people.  If he gets

20   out when he's 45 or 50, he's still going to relate better to

21   younger people, and that makes him more likely to reoffend no

22   matter what his mature age is.  If, as the defendant argues, we

23   have to look at his mental age and he wants to be around young

24   boys, 14-year-old teenage boys, that's who he's going to be

25   around when he gets out no matter what, and that creates a big

1    problem, and that means that he needs to be in custody as long

2    as possible to protect the public.

3         With regard to whether the Court can/should consider the

4    physical abuse allegations detailed in the presentence report,

5    the defendant claims that the Court can be certain the

6    allegations are false because the defendant was never charged.

7    That's just simply a flawed premise to begin with.  Simply

8    because charges weren't brought doesn't mean they didn't occur.

9    We have experienced in this case, and I think the Court can see,

10   these cases are hard to charge, hard to prove.  In the

11   allegations specifically noted, the victims were given alcohol.

12   They didn't know what happened.  They thought things might have

13   happened.  The situations are he said/he said, and as we have

14   seen in this case, the victims are hesitant to testify.  The

15   victim in this case didn't want to come today and tell the Court

16   what had happened.  They're embarrassed.  It's hard for them to

17   talk about.  They're 15 years old.  Simply because there wasn't

18   prosecution doesn't mean that it didn't happen.

19        And I would submit that the evidence contained in the PSR

20   establishes sexual contact with other minors, particularly in

21   paragraph 59 the defendant talks to a 13-year-old boy -- or who

22   appears to be a 13-year-old boy, who identified himself as a

23   13-year-old boy, that he did a good job performing oral sex last

24   time.  That sure seems to indicate that there was prior sexual

25   contact.

1       Now, again, going back to the idea that the boys don't want

2   to talk about sexual contact with anybody, let alone grown men,

3   the person whose Facebook account that was, initials J.M., he

4   denied the activity, but the Facebook messages sure seem to make

5   it pretty clear that it did happen.  So I think the Court can

6   put some confidence in those allegations, but even if you don't,

7   even if you totally discard the allegations of other prior

8   sexual contact, contact only, the 3553(a) factors and the nature

9   of this offense itself warrants a 20-year sentence, the maximum

10  the Court can give, even if you don't consider the allegations

11  of physical contact.

12      This case involved a 14-year-old boy and a second boy, who

13  we believe to be underage even though we were never able to

14  identify him.  The defendant admitted that he thought he was

15  underage, and our victim, who we did identify, said he believed

16  him to be 15 or 16.  The messages show and the defendant admits

17  this was not the first sexual encounter with KV No. 1.  The

18  defendant gave the boys in this case marijuana.  KV No. 1 said

19  that the marijuana was different from other marijuana he had

20  used in the past, possibly indicating it had been laced with

21  something.  According to KV No. 1, the second boy wanted to

22  leave, but the defendant wouldn't take him home, and, again,

23  that is based on something that KV No. 1 said, his recount of

24  the events, but every single thing that KV No. 1 said was

25  corroborated to -- down to the sexual contact with the semen

1    being detected in the sexual assault exam, so there's absolutely

2    no reason to believe that that particular statement that he made

3    about the incident is not true.

4        THE COURT:  That one -- that one is fairly directly

5    disputed, even in the presentence report, by the defendant

6    himself.

7        MS. ALTMAN:  It is --

8        THE COURT:  I mean, there's a lot that is admitted, but

9    that kind of particularly coercive, not letting the victims

10   leave, that part of it is directly disputed by Mr. Brown.

11       MS. ALTMAN:  I would agree with that, but I would

12   submit that the victim is more credible on that particular area

13   based on everything else, that he was corroborated in every

14   other way.  The victim's version of events and how things

15   happened were corroborated by the sexual assault exam with the

16   semen being found in his anus.  The defendant, when he initially

17   provided statements about this, wouldn't even admit that sexual

18   contact occurred, so I would submit that the victim's account is

19   much more credible along those lines.  I do understand that it's

20   disputed, but I think the Court can find, based on everything

21   else, that the other boy tried to leave, and KV 1 says he

22   himself was scared once things changed at the hotel.

23       There's no dispute that KV 1 went with him willingly,

24   although he is only 15; you can't really say consensually.  He

25   went with him willingly.  He knew what was going to happen.

1   That's clear from the Facebook messages, that there was going to

2   be a threesome, but he said that once things got weird at the

3   hotel, he wanted to leave, and the defendant wouldn't let him

4   go.

5           THE COURT:  Yes.

6           MS. ALTMAN:  Looking at the history and characteristics

7   of the defendant, he has a lengthy criminal history.  As a plus,

8   he has been able to maintain employment through his adult life,

9   and that certainly is a positive factor.  However, I would note

10   that it's the type of job that he generally worked in where most

11   of his co-workers were likely to be teenagers, boys, girls.

12   That's generally the type of co-workers you would have in the

13   fast food industry.

14       Additional characteristics of the defendant, even if you

15   want to say that there was no sexual contact with anybody else,

16   there were hundreds and hundreds of sexual messages with minors,

17   and those are detailed in the Facebook messages.  Those can't be

18   disputed.  And we only have the Facebook messages for

19   two-and-a-half months.  We only got it from January of 2017

20   until the date that the minor was recovered, and during that

21   time the defendant communicated with more than 30 boys between

22   the ages of 13 and 18, and in all of these messages, he would

23   ask the age of the boy, and then generally he would tell the boy

24   that he was 19 and say "Age ain't nothing but a number,"

25   acknowledging that even an age difference of 19 and 13 and 19

1    and 15 was a pretty vast age difference, let alone the

2    defendant's true age.

3        In many of these messages, he sent pictures of his penis.

4    He sent pictures of his buttocks.  He asked the boys for similar

5    pictures, and each time a boy sent him a picture of himself, the

6    defendant was receiving child pornography, which is a crime in

7    and of itself.  The defendant's conversations with KV 1 and

8    these other boys show his plan was manipulative, show it was

9    thought out, it was formulaic.  He did it every time.  There

10   were multiple reports of him providing drugs and alcohol to the

11   teenage boys.  We know that he provided marijuana to the boys in

12   this case, which would lend some credence to those other

13   reports.  It also seems to be confirmed by some of the Facebook

14   messages.

15       In the defendant's interview, he showed really no remorse

16   for the activities that took place in this case, really a

17   complete lack of understanding really that having relationships,

18   sexual contact, with minors was wrong, and that really is what

19   makes him dangerous.  The complete lack of awareness that he

20   should not be around teenage boys providing them with marijuana,

21   driving them around in their cars, and having sexual contact

22   with them makes him a tremendous, tremendous danger to the

23   community when he gets out no matter how old he is.

24       The government submits that he should be kept in custody as

25   long as possible, quite frankly, to protect the community, and

1    in this particular case, that's 20 years, which, as the Court

2    noted and I would note, is far beyond the advisory guideline

3    range in this case.

4              THE COURT:  Far below.

5              MS. ALTMAN:  Far below.  What did I say, above?  Far

6    below.

7              THE COURT:  Yes.  All right.  Very good.  All right.

8    Thank you, Ms. Altman.

9         Okay.  Mr. Moyers?

10             MR. MOYERS:  I guess I'd ask the Court would you like

11   me to start with, I guess, the Facebook messages that you've

12   alluded to at the beginning or --

13             THE COURT:  Well, let me -- I have a few questions for

14   you.

15             MR. MOYERS:  Sure.

16             THE COURT:  Let's do it that way, and that way you kind

17   of can address my concerns.  Your sentencing memorandum

18   indicates that it would be reversible error if I were to fall

19   into two pitfalls --

20             MR. MOYERS:  Yes.

21             THE COURT:  -- and that is to consider the physical

22   abuse allegations in paragraphs 52 through 120 and also that --

23   the second pitfall that you identify is how I should interpret

24   the statement that the defendant made that he likes to "chill"

25   with younger people.

```
 1              MR. MOYERS:  Yes.

 2              THE COURT:  And so let's just frame the discussion this

 3      way:  I really rely on counsel to tell me if I'm going to commit

 4      an error that would --

 5              MR. MOYERS:  Yes.

 6              THE COURT:  -- make my sentence unsound so I can count

 7      on that.  But, taking the second pitfall, I can't understand how

 8      it could possibly be reversible error for me to consider his

 9      statement that he likes to "chill" with younger people when you

10      say that "From the mouth of some offenders, the remark might be

11      haunting."

12              MR. MOYERS:  Yes.

13              THE COURT:  And so it seems to me a fair argument to

14      try to interpret that statement by the defendant and try to make

15      sense of it.

16              MR. MOYERS:  Yes.

17              THE COURT:  But I don't see how I would commit

18      reversible error to consider that to be a statement that is

19      consistent with a sustained sexual interest in minors.  How

20      would I be committing reversible error if I thought that is

21      consistent with his demonstrated conduct on Facebook?

22              MR. MOYERS:  Because of all the other circumstances.

23      You saw that, the Court did, saw the interrogation, saw the

24      video.  It is clear that what he means is -- he's not talking

25      with the agents at that point about his sexual interests or what
```

1    he -- I guess, going deeper dark into his soul about what his

2    intention is.  He's talking about -- or they're asking him,

3    "Hey, you seem to spend a lot of time around minors."  Agent

4    Pleming is asking him, "I have been through your Facebook

5    messages for the last two-and-a-half months.  What are you doing

6    talking to all these minors?"  And he, Mr. Brown, says, "Look, I

7    like to chill with them because they don't have those adult

8    concerns like, you know, jobs and families," and I think it's

9    absolutely clear that the Court not read the statement in a, I

10   guess, decontextualized or unmoored state as some naked

11   representation or naked baring of his soul that says, "Yeah, I

12   really, really like -- I'm really sexually interested in

13   minors."

14        I think what he's talking about there is that it's social,

15   and it's such a damaging remark taken out of context and so

16   subject to abuse that I think it would be -- I mean, I think

17   it's unreasonable to conclude as a matter of fact, you know,

18   based on the preponderance of the evidence that it's a remark

19   about his sexual interests and, you know, how he's propelled or

20   what his impulses are with regard to younger boys.

21        THE COURT:  It's a fair argument to try to get me to

22   see that in context, but I can't understand how I would be

23   committing reversible error to understand that remark in the

24   context of his Facebook messages in which he has engaged in many

25   over a two-and-a-half-month period -- that was the only sample

1    that we had -- sexually explicit communications with many people

2    that he identified and verified were minors.

3         So, like I say, I look to counsel to make sure that the

4    legal parameters -- you're free to argue what you want, but if

5    you tell me I'm going to commit a legal error, I really want to

6    know it, and I'm very concerned about the two-and-a-half pages

7    in your brief under the heading that says "to avoid reversible

8    error" I have to avoid considering certain things, and I am not

9    at all persuaded that I would be committing reversible error to

10   understand that the statement that he likes to spend time with

11   younger people doesn't relate to his sexual interest in them.

12        The second concern that I have then is the allegations in

13   paragraphs 52 through 120 --

14             MR. MOYERS:  Yes.

15             THE COURT:  -- which are based substantially on

16   Facebook records, and so I want to understand exactly what

17   you're saying here because I have a couple of observations here.

18   One is that you didn't object -- during the time for objections

19   to the presentence report --

20             MR. MOYERS:  Yeah.

21             THE COURT:  -- you did not lodge any objections --

22             MR. MOYERS:  No.

23             THE COURT:  -- that those allegations were false.

24             MR. MOYERS:  Uh-huh.

25             THE COURT:  And so when I get to the presentence report

1    and I have, you know, 70 paragraphs of allegations that have not

2    been objected to --

3         MR. MOYERS:  Uh-huh.

4         THE COURT:  -- I think that I'm entitled to take those

5    objections [verbatim] at face value.  So maybe your smaller

6    point is or it's a more focused point that there's evidence and

7    assertions in those paragraphs that he had sexual contact with

8    other minors and that that is not established to a preponderance

9    of the evidence, and so if that's the smaller point, then I

10   think -- if that's the more focused point, I think that's maybe

11   a fair point, although I still have to make decisions about

12   what's established to the preponderance of the evidence, and I

13   can consider hearsay in sentencing.  So it's still not quite

14   clear to me that even if I were to determine that, to a

15   preponderance of the evidence, it's established that he had

16   sexual contact with other individuals who were minors, that

17   that -- even that would be reversible error.

18        So you tell me -- I want to know, first, what is the

19   reversible error that you want to identify for me, and then why

20   is it that I couldn't find to a preponderance that he had sexual

21   contact with other individuals when it seems to be the clear

22   implication of some of the Facebook comments.

23        MR. MOYERS:  First of all, with regard to the Facebook

24   comments, I'll just get that out of the way.  Those are what

25   they are.  We don't dispute those.  What we're talking about

1    here and what I wrote in the sentencing memo is that we're

2    talking about allegations of physical abuse, and what we're

3    talking about here is -- you know, the implications or the

4    concern here is that, oh, here is this litany, here is this

5    series of victims, and you have to be -- the Court has to be

6    very, very careful in this context because the language

7    obviously is inflammatory.  It makes us -- it should make us

8    uncomfortable, but that's not a stand-in for proving, yes, this

9    kind of act happened with this person at -- you know, in this

10   general time frame, and that's very important because our

11   intuitions, even mine and I'm a defense attorney, is, well, I

12   guess if there's smoke, there's fire; it must have happened.

13   And, you know, the concern or the pitfall here is that you're

14   going to -- the Court is going to relax its standards based on,

15   well, you know, this is probably what was going on and --

16          THE COURT:  I would agree with you if what I were

17   looking at were the rumors in the community that he had engaged

18   in sexual activity with young people.  That to me comes nowhere

19   close to being substantiated to a preponderance of the evidence,

20   but when I have paragraph 59 and there are -- there's a

21   conversation about "sucking dick" with a minor and the defendant

22   says undisputedly, "Shit, you did a good job last time," that

23   seems to suggest that, in fact, there was oral sex performed by

24   this minor, and that is not -- that's words that are uncontested

25   that came from the defendant posted in a Facebook message.

1          MR. MOYERS:  Yes, and that's one interpretation of it.

2     You could think that.  I don't know who this particular user is.

3     I don't know where he lives.  I don't know if they were just

4     talking -- you know, if they were just engaging in, you know, I

5     guess, fantasy role play.  I mean, when --

6          THE COURT:  Some that's clearly true.  The young man

7     that's in New York, there's no allegation that there was ever

8     any physical contact with that individual in New York, but this

9     one is different because it seems to, in the very context of the

10    conversation, suggest that there had been a history of sexual

11    contact between these two people.

12         MR. MOYERS:  The Court -- it could read it that way,

13    and our view is that that would be a mistake because, look, the

14    language there, not great, but what we're talking about here is

15    whether -- the implication, I guess, is -- and maybe this gets

16    back to the larger argument, which is in all those paragraphs,

17    it is -- the concern I wanted to highlight generally for the

18    Court is just because there are these -- that there is a lot

19    of -- there's a lot of evidence that looks really bad clustered

20    around a bunch of different people, it certainly doesn't mean

21    that they're all true or even mostly true or, you know, true at

22    all.

23         THE COURT:  In fact, you go way further than that in

24    your sentencing memo, and you say they're all demonstrably

25    false.

1          MR. MOYERS:  Yes.  And, look, I think the evidence

2     shows that in this case because, if you remember from the

3     interrogation video, is that the FBI agents -- the reason they

4     keep pressing him for the names and for specifics is because

5     once they know that there's a victim out there, they can't

6     just -- they can't just do nothing, you know.  They don't get

7     into the business of being an FBI agent to just sort of turn a

8     blind eye or say, "Well, there's a victim here but not enough."

9     No, they go after him.  They investigate these cases.

10          THE COURT:  There's a record here that the Rockford

11     police investigated them too --

12          MR. MOYERS:  Sure.

13          THE COURT:  -- but I think Ms. Altman's point is being

14     able to investigate one of these doesn't mean that you can bring

15     charges for sex abuse.  Often the victims are embarrassed.  They

16     don't want to talk about it.  They deny it, and so I can't infer

17     from what I read in this report that there's some sort of

18     dereliction of duty on the part of the Rockford police.

19          MR. MOYERS:  No.  That's exactly my point.  It's that

20     there wasn't and that they --

21          THE COURT:  But the fact that there were no charges

22     that emerged from it doesn't mean that the acts didn't occur.

23          MR. MOYERS:  No, but I think you can --

24          THE COURT:  The standards were higher --

25          MR. MOYERS:  No, not necessarily, but what my point is

1    is there are incentives in the system, both personal and

2    within -- you know, even sort of democratic.  Like, the district

3    attorney in Rockford -- I guess that's Winnebago County -- the

4    district attorney in Rock County, Beloit, they don't get elected

5    by taking a knee on crimes and allegations that are this

6    serious, and law enforcement works very hard -- I mean, the

7    discovery in this case was substantial.  They go after it, and

8    what I'm trying to tell you is that because those incentives

9    show you that, look, this was not under-investigated -- it's not

10   because they were too busy or that Rockford was overwhelmed --

11   the point is that, look, they have strong incentives to bring

12   these cases, and they didn't, and so maybe that point is too

13   indirect or subtle, but, no, I can't necessarily say to you,

14   "Hey, none of this ever happened" just because there weren't

15   charges brought.  I think that misreads my point.  My point is,

16   look, you have to look at the surrounding circumstances, and

17   when you have highly trained, you know, experienced

18   investigators at two levels of government who are looking at

19   this stuff and then nothing can happen, especially when it's a

20   serious crime like this -- we're not talking about

21   shoplifting -- that can tell you something.

22           THE COURT:  All right.  I take your point.  I don't

23   know that it carries me -- I understand your argument.  I don't

24   think it carries me as far as you'd like it to, but let me --

25   here is another concern that I have.

1          MR. MOYERS:  Sure.

2          THE COURT:  I do see the reference in I think it is

3     paragraph -- let's see here -- paragraph 218 is the paragraph

4     that contains the reference to Mr. Brown's IQ.

5          MR. MOYERS:  Uh-huh.

6          THE COURT:  And so here is my issue:  So I have one IQ

7     test taken when Mr. Brown was 14 years old that shows a

8     full-scale IQ of 74.

9          MR. MOYERS:  Yes.

10          THE COURT:  And so one of your arguments in mitigation

11     here, in fact, maybe your main argument in mitigation, is that

12     he's a cognitively impaired individual with a borderline IQ, and

13     so that should be a mitigating factor.  And, yet, Mr. Brown did

14     not consent to the release of all of his mental health records,

15     so rather than having a really comprehensive view of Mr. Brown's

16     mental health, I've got one IQ test from when he's 14 years old,

17     and I don't have the full record of his mental health to make an

18     assessment about whether this one IQ test accurately reflects

19     his cognitive abilities.

20          You've made many statements about how there was a lack of

21     guile in the interview, which I had to look at in connection

22     with the suppression motion, but -- to a point I agree with you

23     that there wasn't a keen level of guile there, but I did not

24     come away from the interview thinking that Mr. Brown was

25     cognitively impaired just based on his conversation and his

1    conduct during that interview.  I look at his record here.  He

2    does not seem to me to be a person who is borderline impaired,

3    and it concerns me that you're trying to make an argument in

4    mitigation based on his mental state without really fully

5    disclosing all of his records and giving me a fair chance to

6    determine whether I have somebody who really is so impaired that

7    it should mitigate his culpability for a serious crime.

8           MR. MOYERS:  A couple of points:  First of all, it may

9    not be apparent to you what his challenges are.  It's very

10   common for people that have those kind of challenges to develop

11   ways of concealing them or getting through or getting by, and

12   that happens all the time.  I mean, I'm constantly surprised as

13   a defense attorney how long it can take me to figure out that

14   somebody can't read, for instance, and so --

15          THE COURT:  I can accept that, but I guess my question

16   then is why not make a fulsome showing to me of what his

17   limitations are?

18          MR. MOYERS:  Yes.

19          THE COURT:  You're totally entitled to withhold the

20   consent --

21          MR. MOYERS:  Yes.

22          THE COURT:  -- but then if you want to make an argument

23   about his mental condition --

24          MR. MOYERS:  Uh-huh.

25          THE COURT:  -- it just doesn't resonate as powerfully

1    as it would if I had a really good picture of his full record.

2            MR. MOYERS:  You're right and -- but I can't pick and

3    choose what gets released or, you know, even get to see it in

4    the first instance.  And, look, Mr. Brown was candid with me

5    from the beginning that he'd been seeing counselors and that he

6    had been -- I guess he's been on different medications, and it

7    would be -- yes, does that undercut my argument here in

8    mitigation?  Yes, definitely.  But I'm not going to -- that's a

9    choice that the defense had to make about whether I want him to

10   keep going to counseling.  I want him to be able to deal with --

11   you know, this is a stressful situation.

12       And so, yes, would it be better for the Court or would my

13   argument have more force if it had more information?  Sure, but

14   I'll get to my final point, which is all the time in all sorts

15   of cases there are mental health records, Department of

16   Corrections records that come in and that are, you know, just

17   taken at face value, and finally we have something here -- taken

18   at face value when they show things about the defendant that are

19   aggravating, not mitigating.  And then suddenly the government

20   is urging the Court to say, "Well, whoa, whoa, whoa.  We don't

21   know what these people meant," and it seems to me that, like,

22   you know, what's good for the goose is good for the gander, is

23   that if we're normally going to say that, look, that these state

24   psychologists, these state corrections officers or counselors,

25   that they're trained professionals and that they do their jobs

1    well and that they take interest and pride in their work, it

2    is -- it's unfair to now, when there's something in there that's

3    mitigating or that would maybe say, "Hey, you need to take a

4    bigger look here at the crime and Mr. Brown," that suddenly

5    there's skepticism.

6          Now, the final point I wanted to make about this is you've

7    seen the video.  I can't argue really what the Court might take

8    from it or not, but I think it's apparent that the bright people

9    in the room, that the people with average or above-average IQs,

10   are on law enforcement's side, and they are not dealing with

11   somebody who has their cognitive skills or goals or cognitive

12   skills or gifts, and I think when you look at that, it

13   underscores, hey, Mr. Brown doesn't know how badly he screwed up

14   and how much trouble he's gotten in, and so that's about --

15   that's all the answer I can kind of give you on that question.

16   I've got one more point, but I want you to finish with your

17   questions.

18         THE COURT:  No.  Those are my -- those are my main

19   concerns.

20         MR. MOYERS:  Okay.  And the final point I wanted to

21   make here is typically if I'm going to push, meaning the defense

22   is going to push, some sort of diminished capacity argument, the

23   defense takes on a serious risk of convincing the Court, well,

24   hey, if this person just doesn't have much agency, my concerns

25   about incapacitation and protecting the public are much, much

1    higher.  What I'm arguing in this case is that that's not

2    necessarily true here, is if you look at Mr. Brown's trajectory

3    before his final term in prison, he's in gang life with the

4    Gangster Disciples.  He is -- the chances that he's going to

5    come out and turn it around to even get a job, low, very low.

6    Instead of that, look, he dramatically changed his life.

7         Now, I'm not asking to say, oh, yeah, let's throw him a

8    parade because now all he's getting are misdemeanors or much

9    lower stuff, but what I'm saying is that from Mr. Brown's point

10   of view, he made dramatic changes, and what I'm saying to the

11   Court is, look, he can learn lessons.  He's going to go to

12   prison for a long time, and I think that gets to sort of how I

13   want to conclude is Ms. Altman and I, we more or less agree on

14   the facts.  We're just talking about what's, you know, the

15   difference here between ten years and she's arguing 20 years,

16   and our argument is, look, ten years is going to do all that,

17   and I'm loud -- she's less loud -- but the point is where does

18   that put us in that range?  And I think looking at everything,

19   you can keep the public safe, you can teach him a lesson, and

20   you can get retribution, real justice, with ten years.

21        THE COURT:  All right.  Thank you.

22        All right.  Mr. Brown, I have your written allocution, but

23   you've got the opportunity to address the Court if you want.

24   You don't have to, but you've got a right to address the Court

25   if there's anything else you want to say before I impose a

1    sentence.

2            THE DEFENDANT:  No, sir.

3            THE COURT:  Okay.  All right.  Thanks.  I'm going to

4    take a brief recess, and we'll come back and finish up the

5    sentencing.

6        (Recess at 11:50 a.m. until 11:57 a.m.)

7            THE COURT:  All right.  I want to thank counsel for

8    their presentations, and I'm going to address the main arguments

9    in mitigation here, which is -- I think I'll work my way through

10   it this way:

11       So I'll accept Mr. Moyers' argument about the individual

12   statement, which he identified in his sentencing memo as the

13   sentencing -- or the second pitfall.  That was the statement

14   about liking to "chill" with young people.  I'm not going to

15   overread that statement and suggest that that's just an express

16   statement of sexual interest in children.  It is, I think,

17   properly viewed as a statement that he enjoys spending time with

18   young people and that -- perhaps because of his level of

19   maturity or he likes the fact that they don't have the stresses

20   of adult life to deal with.  So I'm not going to overread that

21   statement, but I'm not going to take it in isolation either

22   because the Facebook evidence and the other evidence that are in

23   the paragraphs that suggest conduct with others establishes so

24   clearly that he does have a sustained sexual interest in minors,

25   and so I don't need to overread that statement because I have

1    evidence from the defendant's own words in his Facebook

2    communication that he does, indeed, have an enduring interest in

3    minors.

4        Which gets to the second argument in mitigation about the

5    evidence of his conduct with others, and I think my questions

6    indicate my skepticism about Mr. Moyers' suggestion that I

7    should discount that evidence entirely.  So, first of all, let

8    me say this: that the evidence establishes, even if it doesn't

9    establish any physical contact with any other person, it does

10   clearly establish that he has a sustained sexual interest in

11   minors.  He had, in the sample that we had of the communications

12   on Facebook over a two-and-a-half-month period, he had abundant

13   exchanges of sexually explicit communications with minors as

14   well as an exchange of sexually explicit images with them.  So

15   even if it didn't show anything else, it showed that he was

16   substantially engaged in not direct physical -- not necessarily

17   direct physical conduct with minors -- I use the example, I'll

18   repeat it here, of the young man in New York.  There's no

19   suggestion that there was any sexual physical contact with him,

20   but nevertheless, he engaged in sexually explicit conduct and

21   received naked pictures in response with him.  So it was

22   excruciatingly inappropriate, even taking it at face value.

23       But the evidence goes further than that, and I think we

24   already talked about the example when there was a reference in

25   the Facebook communication to the fact that the individual -- I

1    think that one was J.M. -- had done a good job the last time

2    that they met, so the clear implication there is that they had

3    had sexual contact.  But even if I discounted all of that, we

4    still have the investigative reports, and I'll cite paragraph

5    106, where the defendant admitted that he had intended to get a

6    hotel room with two minors that day.  So, again, there's no

7    suggestion necessarily that that was consummated, that they

8    actually spent the time in the hotel, but he admitted that that

9    was his intent to do that.

10        There's also the episode in which the two young men were

11   found at the apartment and both -- a 13-year-old and a

12   17-year-old.  The 13-year-old was highly intoxicated.  There was

13   a paper at the apartment with the defendant's name on it, and

14   then both of those young men later picked the defendant out of a

15   photo lineup to indicate that he was the person who had given

16   them the alcohol and gotten them intoxicated.  So that evidence

17   on various readings, even if you just take it at face value and

18   deal with the Facebook communications, they themselves

19   demonstrate that he has a sustained interest in children.

20        When I look at the broader sweep of the evidence that comes

21   from the police investigation, the defendant's own concessions,

22   it's a very long period of time in which he had engaged in

23   inappropriate conduct with children, plying them with alcohol,

24   and I think those are established way beyond a preponderance of

25   the evidence.  I don't have to reach the conclusion that he

1    actually did engage in physical sexual conduct with other

2    children beyond those that have been established here in the

3    offense of conviction to see that it is his intent and his

4    interest to have sexual contact and sexual communications with

5    children.

6         The third argument, the main argument in mitigation, is Mr.

7    Brown's diminished capacity.  I understand it's a strategic

8    choice that the defense has made not to put in the full evidence

9    of Mr. Brown's mental health records that would allow me to make

10   a more complete evaluation of his mental capacity and any other

11   factors that might impact his decisionmaking, that might

12   diminish his culpability, but the strategic choice -- I infer

13   from Mr. Moyers' comments that it's probably a mixed bag, and so

14   it was a strategic choice to be made that there might have been

15   aggravating material there as well as mitigating material.  I

16   simply don't have it to evaluate, so I don't know what's in that

17   material, but what I'm left with then is just the IQ test from

18   when he was 14 years old when he was clearly a defiant and

19   difficult young man, and so I have no way that I can extrapolate

20   from that one isolated IQ test that he really is -- suffers from

21   a significant cognitive impairment.  And so it's just not

22   established to a preponderance, and I am not persuaded by the

23   argument that he really does have a diminished capacity that

24   would reduce his culpability.

25        The bottom line here is that the evidence is ample here that

1    Mr. Brown is a dangerous sexual predator, and whether he does it

2    because of his affection for young people, the bottom line is

3    that it shows that he has engaged in very dangerous activity and

4    is willing to ply young people with intoxicants to get them to

5    do what he wants, and I do think that Ms. Altman is right that

6    the victim's account of what happened in the hotel room with

7    Victim No. 1 is more credible than Mr. Brown's statement.  Mr.

8    Brown has made statements about matters large and small

9    throughout the record that can't be verified.  He doesn't have

10   the correct information about the address or the streets of his

11   employment.  He doesn't have the dates right, and so he has

12   proven himself to be a very inaccurate historian of his own

13   biography as well as I think has a strong motivation to minimize

14   his culpability for the events at the hotel room, and so I do

15   find that the victim's explanation of the events at the hotel

16   room are the more accurate ones, and, therefore, establish by a

17   preponderance, because I've got potentially two accounts of

18   it -- I believe the victim's story about it -- and that incident

19   suggested some very strongly coercive behavior on the part of

20   Mr. Brown.

21       Accordingly, I'm going to sentence within the guidelines,

22   and the guideline range is 240 months.  It's at the statutory

23   maximum.  I'm also going to impose a lifetime of supervised

24   release on Mr. Brown as well.  It's clear to me that, given the

25   pattern of his conduct, that we can never be completely safe

1    without close supervision.  So I'm going to impose the maximum

2    term of incarceration that I can followed by a lifetime term of

3    supervised release.

4        I did not get any objections to the conditions of supervised

5    release, and so I'll ask Mr. Moyers if there are any concerns or

6    any input that he would like to have now on the conditions that

7    are proposed in the presentence report.

8            MR. MOYERS:  No objections, Your Honor.

9            THE COURT:  All right.  Very good.  So the following

10   conditions are going to be imposed:  It's conditions 1 through

11   9.  Those are among our standard conditions of supervision in

12   the district.  Condition 11, another standard condition, is also

13   imposed, and then special conditions 12 through 24 are imposed.

14   The Circuit suggests that I read these conditions into the

15   record and justify them unless the defendant waives that

16   activity, and so I'll ask if there's a waiver of that.

17           MR. MOYERS:  Yes, there is.

18           THE COURT:  Okay.  Mr. Brown, these are the conditions

19   that will govern your conduct after your incarceration is over.

20   These are the conditions that -- I won't read them into the

21   record here because it would take a long time and it's tedious.

22   They're amply justified in the report, and I've reviewed them,

23   and they're justified here, but I will tell you to read them

24   over with Mr. Moyers, make sure you understand them, and it

25   makes more sense to do it in writing when you've got somebody to

1    talk it over with anyway.  It's more effective than having me

2    drone on about it.

3        But I'll say this:  These are the conditions I will predict

4    will be appropriate when you're released.  If, at that time when

5    you're released and these conditions begin to govern your

6    conduct, you think they need to be revised or amended,

7    additional conditions added or some dropped off or modifications

8    to these conditions, you can make a motion to the Court to do

9    that, and the government or the probation office can do the same

10   thing, so these conditions are not unchangeable.  They can be

11   modified as necessary as we get into the future and when they

12   begin to pertain.

13       So let me make sure we cover the rest of the formalities of

14   the sentence.  As I said, as to Count 1 of the information, it

15   is adjudged that the defendant is committed to the custody of

16   the Bureau of Prisons for a term of 240 months.  I recommend

17   that the defendant receive educational and vocational training.

18   I also recommend that the defendant participate in substance

19   abuse treatment, including an RDAP program.  Also that he

20   undergo a mental health evaluation and subsequent treatment if

21   that is deemed necessary.  I think the presentence report

22   indicates that Mr. Brown has both some potential mental health

23   issues as well as some substance abuse problems that should be

24   addressed in prison.  I don't have a good picture of all of

25   that, but I think it's appropriate that the Bureau of Prisons

1    conduct a careful screening on both the substance abuse issues

2    and mental health issues and that he receive appropriate

3    treatment.

4         I also recommend that the defendant be afforded prerelease

5    placement in a residential re-entry center with work release

6    privileges.

7         The defendant has a pending case in Winnebago County,

8    Illinois.  That's Circuit Case No. 2003-CM-6753 for conduct

9    unrelated to the instant federal offense.  I have the discretion

10   to decide how that sentence should run.  I don't know why the

11   2003 case is still open, but I have imposed a statutory maximum

12   term on Mr. Brown.  It makes sense under these circumstances,

13   although it's unrelated conduct, given the comprehensive nature

14   of the sentence and the lifetime of supervision, I'm going to

15   order that any sentence that would result from the Winnebago

16   County case run concurrent to the federal offense.

17        We've already discussed supervised release and the

18   justification for those conditions.

19        The defendant is adjudged that he is to pay the mandatory

20   $100 criminal assessment penalty to the Clerk of Court for the

21   Western District of Wisconsin immediately following sentencing.

22   The defendant is to pay mandatory restitution to the U.S. Clerk

23   of Court for the Western District of Wisconsin.  However, at

24   this point at least, restitution has not been requested, so I

25   don't know how we handle that.  Is there the time open still for

1    people to submit restitution requests or how should we --

2           MS. ALTMAN:  I would ask -- I'm sorry, Your Honor.  I

3    didn't mean to interrupt.  I would ask that we would leave it

4    open for 60 days.  We will touch base with the victim one more

5    time, tell them that is the time limit, and if they can't get us

6    something by that date, then I don't think that there are other

7    options that I'm aware of.

8           THE COURT:  All right.  Very good.  I'll do that.  I'll

9    hold this open.  There's been no request so far for restitution,

10   but I'll give the victim 60 days yet to submit a request for

11   restitution, and then hopefully the parties can agree on the

12   amount.  If not, we'll schedule a hearing to resolve the amount

13   of restitution.

14       I do find that the defendant does not have the means to pay

15   a fine under guideline Section 5E1.2(c) without impairing his

16   ability to support himself upon release from custody, so I will

17   not impose a fine.

18       Based on the offense of conviction, the defendant is

19   required to pay a $5,000 assessment under the Justice for

20   Victims of Trafficking Act of 2015 unless he is indigent.  The

21   defendant has been appointed counsel, does not have the

22   financial resources to pay his assessment, and so I find that

23   the defendant is, in fact, indigent, and the assessment is,

24   therefore, waived.

25       The probation office is to notify local law enforcement

1    agencies and the state attorney general of the defendant's

2    release to the community.

3        I'm going to inform the defendant of his residual right to

4    appeal.  I notice that there is an appeal waiver in the plea

5    agreement that waives his right to appeal if I sentence within

6    the guidelines, which I have, so there's not much left of the

7    right to appeal, but there could be some residual rights to

8    appeal, and so, Mr. Brown, ordinarily you'd have a right to

9    appeal your conviction and the sentence.  You've waived those

10   rights, but it's still conceivable that there might be some

11   remaining rights if there were some deficiency in the process

12   here.

13       What I want to do is tell you that if you think that you

14   have any basis for appeal, you have to file a notice of appeal

15   within 14 days of entry of judgment in this case or within 14

16   days of any notice of appeal that's filed by the government.  If

17   you can't afford the filing fee for the appeal, you can apply

18   for leave to appeal in forma pauperis, which means without

19   paying the filing fee, and if you can't afford an attorney to

20   represent you in the appeal, you can also apply for

21   court-appointed counsel in the appeal.  And so that is your

22   notice of your right to appeal.

23       Is there anything else we have to take care of today?

24           MS. ALTMAN:  Yes, Your Honor.  The defendant pled to an

25   information.  There is still a pending indictment that -- I

1   would move that that be dismissed.

2           THE COURT:  All right.  I will dismiss the indictment.

3   Okay.

4           MS. ALTMAN:  Nothing else.  Thank you.

5           THE COURT:  All right.  Very good.  Mr. Moyers?

6           MR. MOYERS:  I think we got it all.

7           THE COURT:  All right.  Thank you -- let's check with

8   probation.  Did I miss anything?

9           AGENT HARRIS:  No.  Thank you.

10          THE COURT:  All right.  Very good.  Thank you, all.

11          THE CLERK:  This court stands adjourned.

12       (Proceedings concluded at 12:12 p.m.)

13                               ***

14

15

16

17

18

19

20

21

22

23

24

25

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is a true and accurate record of the proceedings held

4     on the 21st day of December, 2017, before the Honorable James D.

5     Peterson, Chief U.S. District Judge for the Western District of

6     Wisconsin, in my presence and reduced to writing in accordance

7     with my stenographic notes made at said time and place.

8          Dated this 5th day of February, 2018.

9

10

11

12

13

14                              /s/ Jennifer L. Dobbratz

15                         Jennifer L. Dobbratz, RMR, CRR, CRC
                                Federal Court Reporter

16

17

18

19

20

21

22

23

24     The foregoing certification of this transcript does not apply to
       any reproduction of the same by any means unless under the
25     direct control and/or direction of the certifying reporter.